Monica Watson is an African American employee of the VA. She worked there for over 10 years. She worked in the health information area of the hospital as a coder, then a CDI. A coder's position is incredibly important as the hospital relies upon health codes to get paid. A CDI is an advanced coder who also taught the doctors and others how to code their patients. Each and every procedure, meeting, or device given every single patient has to be coded in order for the VA to track their work and to receive payment. Ms. Watson, for 9 of the 10 years she worked for the VA, was an exemplary employee according to her job reviews. She worked hard. She finished her Bachelor of Science degree in health information management and received her RHIA credentialing. She and Phyllis Tisdale were the most highly educated, highly credentialed, and had the most experience in coding. In 2014, Lori Schwab became plaintiff's supervisor. From that point until Ms. Watson was constructively discharged in 2016, she was viewed as a problem employee with an attitude problem who did not want to work at the VA. That characterization was patently untrue. Ms. Watson testified under oath in her EEO affidavit that Schwab treated black employees differently than Caucasians. She singled out black employees for discipline, gave them more difficult and more volume of work than the white employees, setting them up for failure. She gave the black employees quotas that were prohibited by the National MOU and then wrote them up when they were unsuccessful. Conversely, the Caucasians were given the opportunity to train doctors in coding, a job that is supposed to be done by the CDIs, plaintiff's position. The Caucasian black employees, including Ms. Watson, were told that they were an embarrassment and that they could not possibly train doctors. Schwab had the black employees train the white employees, then promoted the white employees over the black employees. Schwab told Ms. Watson that she should go back to where she came from and sent her job announcements as a way of letting her know she was not welcome at the VA. In discovery, we also learned about racial slurs directed at plaintiff, but even if we don't get to those racial slurs, plaintiff has made a prima facie case of discrimination. Both the agency and the lower court have taken a piecemeal look at plaintiff's EEO complaints, attempting to limit her to the verbiage chosen by the agency to define her issues. Both the agency and the court unfairly limited her complaints. When one looks to the evidence adduced during the investigative process, coupled with that found during the course of discovery, plaintiff is set for sufficient facts to allow this case to go to a jury. The issues on appeal are first, whether or not plaintiff administratively exhausted her complaints, and second, whether she made a prima facie case with regard to the underlying complaints. The court made the same error in determining both of those her complaints. In determining that plaintiff failed to exhaust the administrative remedies, she also, in both instances, the court narrowly construed the complaints, which in the federal system are framed by the agency, not the plaintiff. And she failed to broadly construe the complaint under this broadly remedial statute. So the result is, she claimed that plaintiff failed to administratively exhaust her complaints in the informal complaint process, not the formal complaint process, and that she failed to make her prima facie case. With regard to the informal complaint, the lower court ruled that plaintiff failed to properly administratively exhaust her complaints at the informal stage of the investigation, saying that she complained only of the letter of counseling. Now, plaintiff adamantly denies that, and the record supports plaintiff's position that she did, in fact, bring the harassment claims to the EEO counselor in the informal process. In its brief, the defendant has conceded that the agency did actually investigate these complaints, and therefore, plaintiff appears to be waiving any argument that administrative exhaustion did not occur regarding harassment. Unless there are questions about that, then I won't spend further time on that portion of the argument. With regard to retaliation, the plaintiff did also administratively exhaust her retaliation complaints because the court misapplied the standard for retaliation. In order to administratively exhaust those complaints, a plaintiff must file an informal complaint within 45 days of the last act of retaliation. Plaintiff did that when she filed her informal complaint and amended it on November 30th, 2016. The court and the defendant limit retaliation to actions occurring after a complaint of discrimination is actually filed. The law does not so limit these actions. Under Title VII, an employee engages in protected activity when she first opposes any practices that are made unlawful under Title VII, or second, she makes a charge, testifies, assists, or participates in any manner in an investigation, proceeding, or hearing. The court recognized the plain language of Title VII contains an opposition clause and a participation clause. Both the court and the defendant looked only to the participation clause. The opposition clause was met when plaintiff began bringing concerns of discrimination to her employer in 2015, a full year before she was fired. Plaintiff's supervisors began retaliating against her, even going so far as to tell others and to testify that she was a disgruntled employee who was a troublemaker and that she was making a hostile environment for her supervisor, Lori Schwab, by filing these complaints. It was after she began telling administration of the hostile working environment that the verbal discussion that she should leave and the sending of flyers to her to encourage her to leave were occurring. Because the claimed retaliatory incidents are the same incidents as those raised to show discrimination in her formal complaint, nothing prohibited the agency from accepting the retaliation claim as being like or related to those accepted for investigation. This situation differs significantly from a situation in which the retaliatory actions take place subsequent to the investigation. The agency accepted her retaliation amendment and investigated them. To require her to file another complaint for the very same investigation is redundant and unnecessary. The courts that have reviewed similar situations have found that if the investigation would be redundant, there's no reason to require it. And in this instance... Ms. Randles, if you want to get back to the exhaustion in a minute, that would be fine. But before too much more time passes, I did have a question about the adverse employment action. And I'd like you to address that to expressly state what the adverse employment action is in this case. In this case, the adverse employment action is the compilation or the constellation of events that are harassing events. Kim versus Nash Finch lays out the situation in which an individual can have an adverse employment action without actually receiving a diminution in pay or a lower job performance or a discharge. In Kim versus Nash Finch, it explains that the court may look to the totality of the circumstances. And that can include the file with negative reports of the type of employment actions that have serious employment consequences and adversely affect or undermine a plaintiff's position. In this case, the plaintiff wasn't boarded, which prevented her from being qualified for higher positions, while those Caucasians she trained and were under her were promoted over her because they'd been boarded. I have a question, Ms. Israel, on the issue of boarding. I think I understand generally what it means. But what I don't understand is how it is linked with promotion. Because I understood that your client was at a GS-9 already, and there was some discussion of not needing to be boarded. So could you help me understand how boarding is linked to promotion? Yes, absolutely. She was a GS-9 coder. Then when the Title 38 positions were changed, GS-8 was the highest that a coder could be. She was considered an advanced coder at the GS-9 level. But when they changed the Title 38 position, then it changed to a CDI. And so in order for her to become a CDI and therefore be qualified for the 9, 11, 12 positions, she had to be boarded as a CDI. Instead, they grandfathered her as a coder. So as a coder, she would never be allowed to do the CDI style positions, even though that was the title of the position that she was grandfathered into. So the result was that those that had actually been boarded as a GS-9 CDI were allowed then to be promoted on up above that level. Being grandfathered in as a coder prevented her from moving up into the CDI level. Did that make sense? I can't say I understand it completely, but go ahead with your argument. We might need a separate document translating the acronyms. Yes, yes, I understand that. But it's not just the boarding. In this instance, she had the CDI training positions. As a CDI, she was supposed to train doctors and others on how to code. That was the advanced part of the CDI training. And she trained all of the Caucasian employees to be able to do that. But those training positions were taken from her and from the other black coders, and they were told that it would be an embarrassment to have them training the doctors, even though she was the most highly educated, had the most credentials, and was even given plaudits for her customer service skills. She and other black coders were given more work. They were given more difficult work than the Caucasians doing the same job. And she was disciplined for failing to meet quotas. They're not even allowed by the National MOU. What's more, the discipline that was meted out was meted out at a time that she wasn't even at work. She and the other black employees were physically thrown at them. Black employees were required to keep the door to their area open all the time, even though their jobs required them to deal with personal health information. She was told to go back where she came from by her supervisor and sent job announcements encouraging her to leave, and she was the only one to receive that first job announcement. Even the fully successful rating in this instance is an adverse job action, because plaintiff was denied an SAA award that was given to the Caucasian coders as a result. Now, all of these actions, when you put them together holistically, are job actions pursuant to the Kim versus Finch-Nash qualifications. You can also see an Ellis versus Houston. All of these allegations are found in plaintiff's affidavits submitted in the EEO process and in her complaints, and they are under oath. I see that I've used up most of my time, so I'm going to stop unless you have further questions. Very well. Thank you for your argument. Mr. Starr, we'll hear from you. May it please the court, and please, Your Honors, let me know if you continue to have trouble hearing me. Your Honors, my name is Keith Starr, and I represent the Aplii in this case, the Secretary of the Department of Veterans Affairs. I will refer to the record of this argument. Based on the limited record, the admissible evidence, and this court's well-established legal precedent, summary judgment is appropriate in this case. In the record before the court, there are no genuine issues of material fact, and there are multiple reasons why each of these claims fails. That claim fails for two reasons. The first reason being that the appellant didn't submit enough or appropriate admissible evidence to create a genuine issue of material fact to support one of her elements to prove her prima facie case. The other reason is because the appellant has not, under the McDonnell-Douglas burden-shifting framework, rebutted the VA's nondiscriminatory reason for each of the three discrete acts that support her race discrimination claim. Appellant's second claim is for a racially hostile work environment. That claim fails for three reasons. Appellant did not rebut the VA's nondiscriminatory reason for each alleged act. Appellant's third cause of action is for retaliation, and that claim fails for two reasons. Appellant failed to exhaust her administrative remedies, and in any event, she failed to prove her prima facie case. Appellant's last cause of action is for constructive discharge. That claim also fails for two reasons. Appellant has not shown that her working conditions were intolerable, as defined by this court's legal precedent, nor has she shown that she gave the VA a chance to work on fixing her working conditions before she voluntarily resigned on May 27, 2016. As I previously mentioned, Your Honors, there are only three discrete acts at issue to support the appellant's race discrimination claim. The first act involves boarding. Now, there's been some discussion by my opposing counsel as to what boarding is and what boarding is not. Boarding is simply a ministerial act. It's an act where two federal employees are evaluated for a place on the general schedule pay scale. They're evaluated based on their job responsibilities to see where they fall in line in grade and step on a pay scale. Now, boarding also occurs when there is a job title change to an existing federal employee. If an existing federal employee has a job title change that changes her job responsibilities and job duties, then that person will require boarding. That is, if they receive an increase in responsibility, then perhaps based on the administrative procedures governing where they would fall on a pay scale, they may fall on a higher step or grade in the pay scale. However, boarding is never used as a vehicle for promotion. Boarding is simply ministerial and it does not and will not be, it has not and was not used in this case as a vehicle for promotion for their responsibility, which could then lead to promotion? No, Your Honor. That is a great point, but the boarding process merely determines what the employee is going to get paid based on her current job responsibilities, based on her job title, based on her job description, and decides where that employee would fall along the pay scale. In this case, when an appellant was boarded when she initially became a coder in 2010, when an appellant's job title changed in 2014, her job duties were roughly the same and opposing counsel has all but admitted that during this argument that before an appellant's job title change, she was already an advanced coder, so when her job title changed from medical records technician to medical records technician CDIS, her job duties and her job responsibilities were roughly the same. Therefore, the appellant's first-line supervisor determined that the boarding process was unnecessary because she was already getting paid in line with her job responsibilities. The second discreet act that supports appellant's race discrimination claim is receiving a fully successful rating on her annual review in late 2015. Now, a fully successful rating is not a negative performance review. For one, it is a performance review that indicates that the employee has met expectations. So here, the reason why an appellant received a fully successful rating is because she met the expectations that were set for her at the beginning of the year, not because she was performing poorly or because of illegal race discrimination. She simply met the expectations that were set for her, and that's why she received the rating that she did. A second reason why this court should consider the fully successful rating as a non-adverse employment action is because it was never used to reduce the appellant's pay or her benefits or her job responsibilities. As I mentioned before, it was simply used to indicate that the appellant had met expectations set for her at the beginning of the year. The third discreet act that supports the appellant's race discrimination claim is her receipt of a written counseling letter in early 2016. This court has held time and time again that the receipt of a counseling letter by itself is not an adverse employment action. As I understand her claim though, it's the picture. It's under the Kim v. Nash case, which is that there's a number of actions that were taken by the employer that resulted in an adverse employment action and not one individual piece. Can you speak to that? Yes, your honor. In Kim v. Nash Finch company, the procedural posture was slightly different than it is in this case. In Kim v. Nash Finch, the court was deciding a motion for judgment as a matter of law after the entry of a jury verdict. So in the first instance, Kim v. Nash Finch is not controlling here because we're dealing with a different procedural posture. It is not persuasive either because there in Kim, the plaintiff was clearly qualified for a promotion that he didn't receive, but instead the promotion was given to a younger employee that Mr. Kim had in fact trained. The second reason why it doesn't quite fit here and is not very persuasive is because there was copious amounts of evidence in that case that systemic discrimination and retaliation began immediately after Mr. Kim filed a charge of discrimination for being passed over for a promotion. Here, there are, including these three discrete acts of alleged race discrimination, there are five other alleged acts of harassment that are sporadic that do not come in response to a filing of a charge of discrimination. In essence, they seem to be happening randomly and plaintiff believes, it's her subjective belief, that all of these acts are somehow connected and somehow form a systemic problem in the VA. However, based on the record before the court, that just simply is not supported. Is supported? Yes, your honor. In the Kim case, the court said that Kim's duties had been reduced. He received much lower performance evaluations than he had received before filing his charge and he was required to undergo special remedial training. There was also evidence that the company had papered his file with negative reports, including two written reprimands. And that was the gist of why there was held to be an adverse action in that case. Would you say the record here is as good as Kim's record or not as strong? And if so, why? It is definitely not as strong, your honor. In Kim, those systemic actions that you just mentioned occurred immediately after Mr. Kim filed his charge of discrimination. Well, setting aside the timing, I'm just talking about whether there was an adverse action. Yes, your honor. No. When you look at the Kim case, he actually received less job responsibilities. He was well on his way to earning the promotion that he applied for. But because he was passed over and because he filed a charge of discrimination, his responsibilities were actually reduced. And in this case, the appellant's job responsibilities, including her salary, including her benefits, including her basic job title as a coder was never changed, never reduced. Therefore, any of the acts complained of by the appellant, none of the acts complained of by the appellant qualify as an adverse employment action. This is true even if you look at the appellant's alleged claims of harassment. The appellant claims that there were five instances of harassment. First, the appellant claims that her first line supervisor and second line supervisor threatened to shut down her work group, which, by the way, consisted of four coders, three of which were black and one of which were white. And the reason why the VA made that statement to the coders was because the work group lacked productivity. It's important to note that the work group wasn't shut down in late 2015. The second instance of harassment, and my opposing counsel mentioned this before, is when the appellant's first line supervisor set her job vacancy announcements. The reason why the plaintiff's first line supervisor set her job vacancy announcements is because the appellant expressed an interest in obtaining a new job. The third instance of alleged harassment is an allegation that appellant's first line supervisor spoke poorly of her to management. But other than appellant's own self-serving statements, there is no admissible evidence in the record to support that claim. The fourth instance of harassment was the denial of a special advancement award. And it's important to note that appellant did not receive the special advancement award based on something that her first line supervisor said or second line supervisor, but an independent group who decided whether VA employees were deemed worthy of receiving special awards. And in this case, that group decided that appellant wasn't. The fifth instance of alleged harassment are what are styled racial remarks that were made within her group. Now, there's nothing to support this in the record. There are no admissible evidence of this in the record. The only evidence comes from a stray email that mentions all the coders, including the white coder, and a unsigned draft declaration from an employee in the VA that mentions racial remarks made to others. And based on this court's own precedent, sporadic racial remarks aren't enough to create a hostile work environment. Your honors, my time is also up. May I conclude? Your honors. Each of appellant's causes of action, all four of them, fail for multiple reasons. The district court recognized that in its opinion. And for multiple reasons, each of appellant's causes of action must fail now on appeal. Thank you, your honors. Thank you for your argument. Ms. Randles, we'll hear from you in rebuttal. Thank you, your honor. Can you hear me? Yes. Defendant tries to limit the facts of this case to the accepted issues defined by the agency at the very outset of the investigation, claiming that those are the only instances of harassment that can be looked at to determine whether or not plaintiff was discriminated against. Now, if we quit there, there's no reason for an investigation, no reason for a report of investigation, and no reason for discovery. The affidavit and the supporting materials lay out many, many instances of discrimination. The defendant does not give a bonafide, non-pretextual reason for almost all of the allegations the plaintiff has made and put in the summary judgment argument. Rather, they have only chosen three and said that there were valid, justifiable reasons for those three. Well, even if we were to take that and assume that there were valid, justifiable reasons for those three arguments, what about the other seven that were laid out in the report of investigation as the issues that were chosen? And what about the myriad of complaints that are found in the actual affidavit that was submitted with the ROI? None of those have been even touched by the defendant. What we have left then is we have a myriad of complaints that our client made and that we have sufficient information for that was under oath in the report of investigation that have never been denied by the defendants whatsoever. As always, they're trying to limit the facts and limit the elements that can be used. Now, defendant argued with regard to race discrimination that there was no change and that the only time you board is if there's a change in job responsibility. In this case, there was. Plaintiff's job title changed as did her responsibilities, or they were supposed to. But since she was grandfathered in at a GS-9 as a coder, as opposed to going to the CDI, she was not given the responsibilities that she should have been, which would have allowed her to train, to have interaction with others in the hospital, and to otherwise have duties that would allow her to have a higher kind of pay and advancement. The white coders were all boarded, and they were all subsequently advanced, and she was not, even though she trained them. Finally, with regard to the retaliation claim, plaintiff did make complaints directly to Kevin Inkley, who was the second in command of the entire KCVA, and in those meetings in April of 2015 laid out her complaints. After that, she was retaliated against. Plaintiff did make the appropriate complaints. Your time has expired. We thank you for your argument. Thank you so much. Very well. Thank you to both counsel. The case is submitted.